UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EILEEN DECHBERY,

        Plaintiff,

- against -

NANCY A. BERRYHILL, ACTING COMMISSIONER
OF SOCIAL SECURITY,

        Defendant.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
18-CV-3579 (RRM)

ROSLYNN R. MAUSKOPF, Chief United States District Judge.

    Plaintiff Eileen Dechbery brings this action against the Commissioner of the Social Security Administration ("the Commissioner") pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the Commissioner's determination that she is not entitled to social security disability insurance benefits ("SSDI") under Title II of the Social Security Act ("the Act"). Before the Court is Dechbery's motion for judgment on the pleadings and the Commissioner's cross-motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Plaintiff's Notice of Motion (Doc. No. 15); Defendant's Notice of Motion (Doc. No. 17).) For the reasons set forth below, the Commissioner's motion is denied, Dechbery's motion is granted, and the matter is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I. Relevant Facts

    On May 8, 2019, the parties filed a joint stipulation of facts. (Doc. No. 18-1.) The facts set forth therein are hereby incorporated in this Memorandum and Order by reference. Because

the Court incorporates these facts, only additional facts that are pertinent to this Memorandum and Order are discussed below.

Dechbery was born on July 19, 1979, and currently lives in Staten Island, New York. (Transcript ("Tr.") (Doc. No. 19) at 30, 50.) She attended two years of college, first majoring in psychology and then in nursing, but did not obtain a degree in either subject. (*Id.* at 52–53.) Dechbery last worked as an emergency medical technician with the Fire Department of the City of New York ("FDNY"). (*Id.* at 74–75.) Previously, she had had worked as a medical authorization clerk and as a phlebotomist. (*Id.* at 80.) While working for the FDNY she had three incidents of workplace injuries. (*Id.* at 561–62.) First, on March 3, 2011, she suffered an injury to her left hand and wrist. (*Id.* at 561.) She was placed on light duty when she returned to work. (*Id.*) She had her second injury when she suffered a panic attack while speaking with a supervisor on October 11, 2011. (*Id.*) On December 27, 2011, she had a third incident when she tripped and injured her foot and ankle. (*Id.* at 561–62.)

Dechbery began psychiatric treatment with Dr. Hriso in May 2010, prior to her first workplace injury. (*Id.* at 467, 506.) Following an evaluation of Dechbery, Dr. Hriso opined that Dechbery suffered from post-traumatic stress syndrome as well as adult ADD. (*Id.* at 506, 515.) Dr. Hriso also noted a history of domestic violence with Dechbery's ex-boyfriend or ex-spouse. (*Id.* at 512.) He began prescribing Dechbery with Trazadone and Xanax in 2010. (*Id.* at 509.) In October 2010, Dr. Hriso wrote a note indicating that Dechbery was under his care for post-traumatic stress disorder due to events at work. (*Id.* at 506.)

Dechbery's prescriptions changed in 2011, when she stopped taking Trazadone but continued to take Xanax at the direction of Dr. Hriso. (*Id.* at 504–05.) In August 2011, Dr. Hriso planned to taper Dechbery off her medications while she was pregnant. (*Id.* at 503.) In

February 2012, however, Dechbery's anxiety was severe enough that Dr. Hriso prescribed Xanax once more, despite Dechbery's pregnancy. (*Id.* at 501.) In April 2012, Dr. Hriso noted that Dechbery was recently diagnosed with carpal tunnel disorder. (*Id.* at 500.)

Dechbery was placed back on her medications by January 2013, when she was noted to have severe depression, anxiety, and ADD. (*Id.* at 498.) In August 2013, Dechbery's diagnosis was changed to be depression, severe anxiety, and ADHD. (*Id.* at 494.) In December 2013, Dechbery was noted by Dr. Hriso to be "extremely anxious." (*Id.* at 492.) In February 2014, Dr. Hriso continued to note severe anxiety. (*Id.* at 491.)

In April 2014, Dechbery's diagnosis was changed to ADD, PTSD, and anxiety. (*Id.* at 489.) In July and August 2014, Dr. Hriso noted severe anxiety and anxious mood. (*Id.* at 487.) In November 2014, Dr. Hriso wrote a letter stating that Dechbery suffered from severe PTSD which persisted despite treatment. (*Id.* at 485.) In March 2015, Dr. Hriso noted again that on examination Dechbery presented with "severe anxiety." (*Id.* at 482.)

By September 2015, Dechbery was noted to be socially isolated. (*Id.* at 479.) This social isolation continued in November and December 2015, February 2016, and May through September 2016. (*Id.* at 473–79.) In December 2016 and January 2017, Dr. Hriso noted that Dechbery suffered from severe anxiety with poor concentration. (*Id.* at 471.) A letter written by Dr. Hriso in October 2015 details Dechbery's condition and opines that she suffered from severe anxiety in the context of PTSD and had a poor prognosis. (*Id.* at 467–69.) Dr. Hriso noted that Dechbery was unable to deal with stressful situations, cannot use appropriate judgment, cannot deal with the public, and cannot function independently. (*Id.* at 469.)

Dechbery appeared for an examination of her physical injuries with a third-party consultative examiner on June 28, 2016, and it was noted that she was tearful throughout the

3

exam, complained that she was anxious, and needed to interrupt the examination due to her psychiatric conditions. (*Id.* at 564.)

## II. Dechbery's Application for Benefits

Dechbery filed a claim for SSDI benefits on June 5, 2014. (Tr. at 89.) She amended her onset date to March 10, 2012, to coincide with her last day of employment with the FDNY. (*Id.* at 232–33.) Her claims were denied on October 10, 2014. (*Id.* at 103–08.) On November 6, 2014, Dechbery filed a request for hearing before an administrative law judge, and on April 11, 2017, she appeared before ALJ Lisa Hibner. (*Id.* at 44–88; 115–16.) On May 12, 2017, ALJ Hibner issued a decision denying Dechbery's claims. (*Id.* at 8–32.) Dechbery requested review of this denial on July 12, 2017, but on April 18, 2018, the Appeals Council denied Dechbery's request for review, thereby making ALJ Hibner's decision the final decision of the Commissioner. (*Id.* at 1–7; 213–14.) Dechbery filed this action on June 20, 2018. (*See* Complaint ("Compl.") (Doc. No. 1).)

## III. Medical Opinion Evidence

Because the Court is remanding this case on the basis of Dechbery's psychiatric condition, only medical opinions which deal with Dechbery's mental disorders are addressed below.

### A. Medical Opinion of Treating Psychiatrist Paul Hriso, M.D.

On February 13, 2017, Dr. Hriso, a psychiatrist, completed a medical assessment form for Dechbery. (Tr. at 463–66.) Dr. Hriso noted that he had seen Dechbery on a monthly basis since June 2011. (*Id.* at 463.) Dr. Hriso wrote that Dechbery had "severe anxiety," "panic disorder," "severe advanced post-traumatic stress disorder," "social isolation," and "total stress intolerance." (*Id.*) Dr. Hriso opined that Dechbery had no useful ability to make the following

4

work adjustments: follow rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration.  (*Id.*)  He noted that the supporting symptoms and findings included Dechbery's severe anxiety and her reliving of stressful events.  (*Id.* at 464.)

According to Dr. Hriso's assessment, Dechbery would have no useful ability to complete either detailed or simple job instructions, and her signs and symptoms were her severe social isolation and total stress intolerance.  (*Id.*)  Dechbery also reportedly exhibited severe anxiety, poor concentration, and poor short-term memory.  (*Id.*)  Dr. Hriso further noted that Dechbery could not maintain her personal appearance within standards for employment and would have no useful ability to behave in a stable manner, relate predictably in social situations, or demonstrate reliability.  (*Id.* at 465.)  Finally, Dechbery could not leave home without severe anxiety and panic attacks, suffered from poor concentration, and suffered severe anxiety when driving.  (*Id.* at 465.)

### B. Medical Opinion of Consultative Examiner David Lefkowitz, PhD

On August 16, 2014, Dechbery was examined by psychologist David Lefkowitz, PhD, pursuant to the Commissioner's request.  (Tr. at 457–60.)  Dr. Lefkowitz noted that Dechbery was brought to the examination by her husband, was thin but neatly dressed, and that she was distraught throughout the examination.  (*Id.* at 457–58.)  At this appointment, Dechbery stated that she had a history of domestic violence since 2007, when a former fiancé threatened her and "put a price on her head."  (*Id.* at 457.)  She recounted being forced to leave the FDNY due to hazing and harassment.  (*Id.*)

Dr. Lefkowitz noted that Dechbery has lapses in concentration and memory and had reported thoughts of killing herself, but had no plan to do so.  (*Id.* at 457–59.)  He wrote that

Dechbery was "reliving her trauma over and over again," had been abused and "treated horrifically," and that she "has been traumatized since." (*Id.* at 459–60.) Dr. Lefkowitz recommended therapy and opined that Dechbery's prognosis was fair with intensive treatment. (*Id.*)

### C. Medical Opinion of State Agency Psychiatric Consultant S. Hou, M.D.

On September 8, 2014, state agency psychiatric consultant S. Hou, M.D., a psychiatrist by designation, reviewed Dechbery's file. (Tr. at 90–100.) Dr. Hou opined that Dechbery had moderate limitations in activities of daily living ("ADLs"), in maintaining social functioning, and in maintaining concentration, persistence, and pace. (*Id.* at 97–98.) Dr. Hou noted that although Dechbery had been found to be distraught in her recent consultative examination, she had been able to care for her 2-year-old daughter. (*Id.* at 98.)

### IV. ALJ Hearing

Dechbery testified at her hearing that she did not get medical care as often as she believed was needed, as she could not afford the various co-payments. (Tr. at 52.) She had previously undergone carpal tunnel release surgery on both hands but continued to have neuropathy, and now needed to wear support braces on her wrists to avoid dropping objects. (*Id.* at 54–55.) Additionally, she occasionally wore a sling because of ongoing issues with her shoulder. (*Id.* at 55.)

According to her testimony, Dechbery saw a psychiatrist monthly for her PTSD; she would attend in person if she was able to take a car, but otherwise would talk by phone. (*Id.* at 56.) She wanted to get additional counseling for PTSD and complained that she was very embarrassed by the situation. (*Id.*) Although her medication could calm her, it would not help during panic attacks. (*Id.*) She noted that she was having a panic attack at the hearing. (*Id.*)

6

When asked if she wanted a break, Dechbery responded that she had been panicking for several days and wanted to get the hearing over with. (*Id.*) She further testified that she had trouble leaving the house – even to walk around the corner – because she feared others and feared having a panic attack while she was away from her home. (*Id.* at 58.)

As a result of her carpel tunnel-related injuries, Dechbery continued to have numbness in her hands, especially at night. (*Id.*) She testified that she and her husband care for her daughter and have two English mastiffs and two cats. (*Id.* at 59.) Her husband helps her do laundry, does the shopping, and prepares the family's meals. (*Id.* at 60–61.) She noted that she frequently will start cleaning the house, but will not finish, and that as result of her depression and anxiety she will go up to seven days without showering. (*Id.* at 60–61.) She testified that she does not watch television or read, that she can use a computer but does not use social media, that she has no hobbies, and that she does not go to restaurants or movies. (*Id.* at 62.) She used to go to church, but no longer does because of her PTSD. (*Id.*) She withdrew her daughter from a catholic school because it required her to be too involved with school activities. (*Id.*)

Dechbery testified that her mind races and she cannot sit still during the day, and noted that after her daughter leaves the house, "I call my husband, and I panic." (*Id.* at 62–63.) Dechbery further testified that multiple stressful activities can cause her to have a panic attack. (*Id.*) These triggers include hearing the doorbell, going to an appointment, or dealing with strangers. (*Id.*) Once she has a panic attack, she cannot recover for the rest of the day. (*Id.*) Dechbery testified that she "vividly" remembered the day at work when she fell while pregnant and was left there for hours despite being in the midst of a high-risk pregnancy. (*Id.* at 66.)

Dechbery's husband, Jonathan Dechbery, also testified at the hearing. (*Id.* at 69–72.) According to his testimony, Dechbery's condition had deteriorated and he had picked up the

slack. (*Id.* at 70.) As a result, he was responsible for all the shopping, and he brings her anywhere she needs to go. (*Id.*) He corroborated Dechbery's claim that she will at times go several days without showering. (*Id.* at 70–71.) He testified that Dechbery had difficulty keeping a schedule and keeping appointments "almost every time." (*Id.*) He also recounted that on a recent sunny day she had closed the windows so that the house was dark and noted that she did not want to be around others. (*Id.*)

Vocational Expert Mark Cheairs also testified at the hearing. (*Id.* at 73–86.) ALJ Hibner posed a series of hypotheticals for a person of Dechbery's age, education, and past relevant work. First, ALJ Hibner inquired what light-exertion jobs might be available that allowed for occasional postural limitations, no exposure to pulmonary irritants, and involved simple, routine tasks, frequent contact with others, and simple work-related decisions. (*Id.* at 81.) Cheairs stated this would preclude past work but listed possible jobs such as bagger (DOT 920.687-018), garment sorter (DOT 222.687-014), and mail room clerk (DOT 209.687-026). (*Id.* at 81–82.) In a second hypothetical, ALJ Hibner added manipulative limitations where frequent reaching, fingering, feeling, and handling would not be required. (*Id.* at 82.) Cheairs testified that all of the jobs would remain appropriate. (*Id.* at 82–83.) As a third hypothetical, ALJ Hibner asked about jobs where occasional reaching, fingering, feeling, and handling would not be required. (*Id.* at 83.) Cheairs testified that this would eliminate all three jobs, but that Dechbery could still be a "photo clerk counter person" (DOT 249.336-010). (*Id.* at 83.)

ALJ Hibner's fourth hypothetical applied the manipulation limits of the second hypothetical, and added that contact with others would be occasional. Under these factors, Cheairs stated that the three original jobs would still be appropriate. (*Id.* at 84.) As a final hypothetical, ALJ Hibner stated that both the manipulative limitations and the contact with

8

others would be occasional. (*Id.* at 84.) Cheairs opined that this would result in no jobs. (*Id.*) Cheairs noted that an individual would not be unemployable if she were off task 20% of the day or unable to use appropriate work judgment. (*Id.* at 85.) Additionally, an individual would not be employable if she missed more than one day of work per month. (*Id.* at 86.)

## V.     ALJ Hibner's Decision

On May 12, 2017, ALJ Hibner issued her written decision finding Dechbery not disabled within the meaning of the SSA. (*Id.* at 8–32.) In the decision, ALJ Hibner followed the familiar five-step process for making disability determinations:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix I of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled. [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920(a)(4).

At step one, ALJ Hibner found that Dechbery had not engaged in substantial gainful activity since the amended alleged onset date of March 10, 2012. (Tr. at 13.) At step two, ALJ Hibner found that Dechbery was severely impaired by the following ailments: PTSD, panic disorder, rotator cuff tear, carpal tunnel syndrome, and tenosynovitis. (*Id.*) ALJ Hibner noted that Dechbery additionally suffered from the non-severe impairment of chronic sinusitis. (*Id.* at 14.) Dechbery also had a moderate limitation in understanding, remembering, or applying

9

information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing herself. (*Id.* at 15.) At step three, ALJ Hibner considered Listings 1.02, 1.08, 12.04, 12.06, and 12.15, and found that these impairments did not meet or qualify as the medical equivalent of any of the listed impairments in Appendix 1 of the regulations. (*Id.* at 14–16.) As Dechbery had been able to complete some household chores, care for her daughter, and "interact with others, including clinicians," ALJ Hibner also found paragraph C criteria for Listings 12.04, 12.06, and 12.15 were not met. (*Id.* at 16.)

Next, in analysis germane to steps four and five, ALJ Hibner assessed Dechbery's residual functional capacity ("RFC") and determined that Dechbery had the RFC

> to perform light work . . . , except that the claimant can occasionally climb ramps, stairs, ladders, ropes and scaffolds. She can occasionally balance, stop, kneel, crouch and crawl. She can never be exposed to dust, fumes or irritants . . . . [She] is limited to performing simple, routine tasks. She can respond appropriately to supervisors and the public frequently. She is limited to simple, work-related decisions for dealing with changes in a work setting. [She] can frequently reach, handle, finger, and feel bilaterally.

(Tr. at 16–17.) In making this determination, ALJ Hibner gave "no weight" to the opinion of the treating psychiatrist Dr. Hriso, stating that the opinion was inconsistent with other evidence of record, and that "Dr. Hriso apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (*Id.* at 27.) ALJ Hibner acknowledged that Dechbery was seen and evaluated by Dr. Lefkowitz, but did not consider Dr. Lefkowitz's diagnosis of post-traumatic stress disorder and did not assign any weight to Dr. Lefkowitz's opinions. (*Id.* at 25.)

At step four, ALJ Hibner found that Dechbery could not return to her past relevant work as either an emergency medical technician, a phlebotomist, or a medical technician. (*Id.* at 30.)

10

At step five, ALJ Hibner found that there existed a significant number of jobs in the national economy that Dechbery could perform.  (*Id.* at 30–31.)  Accordingly, ALJ Hibner found that Dechbery was not disabled within the meaning of the SSA from March 10, 2012, through the date of the decision.  (*Id.* at 32.)

## STANDARD OF REVIEW

In reviewing the final determination of the Commissioner, a court does not determine *de novo* whether the claimant is disabled.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, a court "may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chafer*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).  "'[S]ubstantial evidence' . . . [is] 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Where the Commissioner makes a legal error, a "court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted).  Instead, an ALJ's failure to apply the correct legal standards is grounds for reversal.  *See id.*

## DISCUSSION

As explained below, ALJ Hibner made two errors which require remand of this case.  First, ALJ Hibner failed to give proper weight to the opinion of Dr. Hriso, as well as to Dr. Lefkowitz's supporting opinions.  Second, ALJ Hibner did not properly consider whether Dechbery met or equaled Listing 12.15.  Particularly, ALJ Hibner erred in her analysis of

11

whether Dechbery met the "A" and "C" criteria necessary to prove that she equaled Listing 12.15.

## I. Treating Physician Rule

Under the treating physician rule, an ALJ is bound to give "controlling weight" to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)" where that opinion is "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *accord Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Shaw*, 221 F.3d at 134. At the time of ALJ Hibner's decision, a "treating source" was defined as a claimant's "physician, psychologist, or other acceptable medical source" who provides, or has provided, the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. §§ 404.1502, 416.902 (2016).

When controlling weight is not given to a treating physician's opinion, the ALJ must give "good reasons" for whatever weight is assigned. *Halloran*, 362 F.3d at 32. In doing so, the ALJ is bound to consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's opinion; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. *See* 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *see also Halloran*, 362 F.3d at 32; *Shaw*, 221 F.3d at 134. Where an ALJ does not appear to have taken these factors into consideration, the Court cannot find that the ALJ has given good reasons. *See, e.g.*, *Sanchez v. Colvin*, No. 13-

12

CV-929 (MKB), 2014 WL 4065091, at *12 (E.D.N.Y. Aug. 14, 2014). Furthermore, in such circumstances, remand is appropriate. *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("Failure to provide such good reasons for [declining to credit] the opinion of a claimant's treating physician is a ground for remand." (internal citations and quotation marks omitted)); *Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

In contrast to the opinions of treating physicians, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013). "[W]ith regard to non-examining physicians' opinions: 'The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.'" *Ridge v. Berryhill*, 294 F. Supp. 3d 33, 61 (E.D.N.Y. 2018) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990)) (internal quotation marks omitted); *accord* 20 C.F.R. §§ 404.1527(c)(l), 416.927(c)(l) ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

ALJ Hibner erred when, in determining Dechbery's RFC, she failed to address all of the factors that needed to be considered and offered no good reasons for assigning no weight to the opinion of Dechbery's treating source, Dr. Hriso. Prior to rendering his opinion, Dr. Hriso and Dechbery had a history that involved extensive treatment on a consistent, monthly basis for several years. This history was not considered in ALJ Hibner's decision, nor was the fact that Dr. Hriso was a board-certified specialist.

ALJ Hibner also failed to consider the fact that Dr. Hriso's opinions were consistent with those of the only other examining psychiatric source, Dr. Lefkowitz. (Tr. at 457–460.) After examining Dechbery, Dr. Lefkowitz rendered the same diagnosis as Dr. Hriso – post-traumatic stress disorder. (*Id.* at 459.) Dr. Lefkowitz opined that Dechbery continued to re-live her trauma over and over again. (*Id.*) At no point in the decision did ALJ Hibner even acknowledge Dr. Lefkowitz' findings, nor did she address the fact that they were consistent with Dr. Hriso's findings.

Explaining that Dr. Hriso's opinions were entitled to "no weight," ALJ Hibner claimed that they were not consistent with the fact that Dechbery had been found to have "okay" memory and concentration on mental status examinations. (*Id.* at 27.) ALJ Hibner further noted that Dechbery had been found to have consistently "normal" findings on mental status examinations. (*Id.* at 24.) Yet, contrary to ALJ Hibner's characterization, Dechbery's mental status examinations consistently found that she exhibited "severe" anxiety. (*See, e.g.*, Tr. at 482, 487.)

ALJ Hibner compounded this error by basing her decision on the conclusion that "Dr. Hriso apparently relied quite heavily upon Dechbery's subjective reports." (*Id.* at 27.) This is not apparent from the record. According to SSA regulations, the Commissioner must "make every reasonable effort" to assist the claimant in developing a "complete medical history" for at least the twelve months prior to the filing date of the claim. 20 C.F.R. § 404.1512(d). Furthermore, "[i]t is the rule in our circuit that the 'ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty . . . exists even when . . . the claimant is represented by counsel." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citations and quotations omitted). Thus, if the claimant's medical record is inadequate, it is "the ALJ's duty to seek additional information from

14

the [treating physician] *sua sponte*." *Schaal*, 134 F.3d at 505; *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."). Under the circumstances, ALJ Hibner had an obligation, if necessary, to request additional information or clarification from Dr. Hriso regarding the basis for his opinion, rather than make assumptions as to his rationale. The fact that there was ambiguity as to the basis upon which Dr. Hriso formed his opinions constitutes a "clear gap" in the record, which, as explained in *Rosa*, ALJ Hibner should have at least attempted to fill. *Rosa*, 168 F.3d at 79. ALJ Hibner erred in assuming that Dr. Hriso based his opinion on Dechbery's self-reports rather than his own observations made over the course of a long treatment history. In sum, this case must be remanded because ALJ Hibner violated the treating physician rule.

## II.     ALJ Hibner's Listing 12.15 Analysis

An ALJ must determine whether a claimant's impairment meets or equals an impairment listed in "The Listing of Impairments" ("the Listings"). *See* 20 C.F.R. Part 404, Subpt. P, App. 1. The Listings describe specific impairments of each of the major body systems that are considered "severe enough to prevent a person from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Most of these impairments are "permanent or expected to result in death." 20 C.F.R. §§ 404.1525(c)(4), 416.925(c)(4). For some impairments, the evidence must show that the impairment has lasted for a specific time period. *Id.* "For all others, the evidence must show that [the] impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months." *Id.* If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

15

The Listings describe the "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). A mere diagnosis is insufficient to meet or equal a listed impairment. *See* 20 C.F.R. 404.1525(d). To meet a listed impairment, a claimant must establish that he or she "satisfies all of the criteria of that listing, including any relevant criteria in the introduction." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). If a claimant's impairment is not listed, then the impairment will be compared to listings that are "closely analogous" to the claimant's impairment. 20 C.F.R. § 404.1526; *see also* 20 C.F.R. § 416.926 (explaining medical equivalence). Listing 12.15 outlines the following criteria:

> **12.15 Trauma- and stressor-related disorders (see 12.00B11), satisfied by A and B, or A and C:**
>
> A. Medical documentation of <u>all</u> of the following:
>    1. Exposure to actual or threatened death, serious injury, or violence;
>    2. Subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks);
>    3. Avoidance of external reminders of the event;
>    4. Disturbance in mood and behavior; and
>    5. Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance).
>
> AND
>
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
>    1. Understand, remember, or apply information (see 12.00E1).
>    2. Interact with others (see 12.00E2).
>    3. Concentrate, persist, or maintain pace (see 12.00E3).
>    4. Adapt or manage oneself (see 12.00E4).
>
> OR
>
> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>    1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); <u>and</u>

> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

ALJ Hibner erred in her Listing 12.15 analysis in three ways. First, ALJ Hibner's "A" criteria analysis failed to consider that Dechbery "re-experiences" her trauma. It was the finding of both Dechbery's treating psychiatrist and the consultative examiner that Dechbery relives her trauma "over and over again." While ALJ Hibner acknowledged that Dr. Hriso found that Dechbery re-lived her trauma, this was not considered with regard to the listing, as is required by 12.15 A(2). Moreover, ALJ Hibner failed to acknowledge that Dr. Lefkowitz specifically made the finding that Dechbery re-lived her trauma over and over again. This was error – proper consideration of this fact may have resulted in a finding that Dechbery meets the "A" criteria of listing 12.15.

Second, in concluding that Dechbery did not meet the "C" criteria, ALJ Hibner did not consider the fact that Dechbery had seen a psychiatrist for more than five years on a consistent, monthly basis and had been prescribed medication throughout that period without success in fully alleviating her symptoms. Moreover, the record supports that Dechbery was helped by the prescribed medication. For instance, Dechbery needed to resume taking Xanax during her pregnancy, despite initially discontinuing it due to concerns for the child she was carrying. Although the medication brought some improvement, Dechbery was still not capable of functioning fully. It was the finding of Dr. Lefkowitz that Dechbery's prognosis was only "fair" with "intensive treatment" and that her illness would cause significant limitations in her ability to function, despite the fact that she was taking medication. ALJ Hibner did not properly consider these facts.

17

Third, ALJ Hibner erred in asserting that Dechbery's ability to engage in ADLs, to speak to clinicians, and to care for her child were all inconsistent with a finding that Dechbery met the "C" criteria. (Tr. at 16–18, 20, 28.) The ability to speak with a trained medical professional in a clinical setting cannot be equated with the ability to sustain ordinary stress of interacting with the public in general. And as courts in this Circuit have previously explained, ALJs may not infer non-disability from one's ability to parent a child. *See, e.g.*, *Harris v. Colvin*, 149 F. Supp. 3d 435, 445–45 (W.D.N.Y. 2016) (citing cases).

In sum, ALJ Hibner failed to properly consider whether Dechbery met or equaled Listing 12.15. The Court therefore remands with the direction that the ALJ properly consider whether Dechbery has met the criteria of Listing 12.15.

## CONCLUSION

For the reasons set forth above, the Commissioner's cross-motion for judgment on the pleadings is denied, and Dechbery's motion for judgment on the pleadings is granted to the extent it seeks remand. This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Order. The Clerk of Court is respectfully directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: Brooklyn, New York  
        May 18, 2020

*Roslynn R. Mauskopf*  
_____  
ROSLYNN R. MAUSKOPF  
Chief United States District Judge